730 A.2d 451 (1999)
322 N.J. Super. 156
STATE of New Jersey, Plaintiff-Appellant/ Cross-Respondent,
v.
Robert DOUGLAS, Defendant-Respondent/ Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 10, 1999.
Decided June 17, 1999.
*452 Raymond W. Hoffman, Assistant Essex County Prosecutor, for plaintiff-appellant/cross-respondent (Patricia A. Hurt, Essex County Prosecutor, attorney; Mr. Hoffman, of counsel and on the brief).
Carl J. Herman, Designated Counsel, for defendant-respondent/cross-appellant (Ivelisse Torres, Public Defender, attorney; Mr. Herman, of counsel and on the brief).
Robert Douglas, defendant-respondent, filed a pro se brief.
Before Judges STERN, BRAITHWAITE and WECKER.
The opinion of the court was delivered by STERN, P.J.A.D.
The State appeals from the grant of post-conviction relief (PCR) "based upon [defendant's] claim of a violation of his Sixth Amendment right to speedy trial, and as a consequence thereof, [dismissing] the indictment," which charged him with murder and other offenses. The order states that "the remainder of petitioner's claim for Post-Conviction Relief be and are hereby denied for the reasons set forth on the record on September 25, 1998." The judge stayed his decision for 20 days, and an additional 30 days, to permit the State to appeal and seek emergent relief, and we ultimately stayed the dismissal and release pending appeal.
The State contends that "defendant was not deprived of his Sixth Amendment right to a speedy trial", or in the alternative, "this matter should be remanded to the Law Division for an additional hearing." Defendant cross appeals, claiming that he is also entitled to PCR because an uncounselled statement to Court Officer Contreras *453 violated his right to counsel, and because the warrant leading to his arrest was issued without probable cause.[1]
We conclude that defendant was not denied his constitutional right to a speedy trial and agree with the PCR judge's disposition of the other issues presented to him. Accordingly, we reverse the grant of PCR.

I.
On October 14, 1987, defendant was charged in Essex County Indictment No. 3400-10-87 with two counts of murder, N.J.S.A. 2C:11-3a(1) and (2) (counts one and two); aggravated assault, N.J.S.A. 2C:12-1b(1) (count three); possession of a handgun without a permit, N.J.S.A. 2C:39-5b (count four); and possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4a (count five). Tried as a capital case, defendant was convicted by jury on all counts in a verdict returned on November 16, 1990. On December 13, 1990, defendant was sentenced to concurrent terms of life imprisonment with thirty years to be served before parole eligibility on counts one and two, and to concurrent terms on the remaining counts. Defendant's motion for a new trial was denied.[2]
We affirmed defendant's conviction on June 23, 1995. In so doing, we declined to consider defendant's claims of "denial of a speedy trial, denial of counsel, ineffective assistance of counsel and conflict of interest of counsel" because of the "undeveloped and incomplete" nature of the record. We specifically noted that our affirmance was without prejudice to a petition for post-conviction relief.
After unsuccessfully seeking federal habeas corpus relief because of failure to exhaust State remedies, defendant filed his petition for post-conviction relief on December 2, 1997. An evidentiary hearing was conducted, after which the PCR judge concluded that defendant was denied his Sixth Amendment right to a speedy trial.

II.
The trial evidence was set forth at length in our opinion on the direct appeal. It included forensic evidence which linked the bullets found on the victims' bodies to a weapon found on defendant at the time of arrest. Defendant lived in the apartment adjacent to the homicide victims and the opinion details the trial testimony regarding the police investigation:
At trial, it was stipulated that [Deborah] Neal called the East Orange police at 9:30 a.m. on August 8, 1987, reported the shootings and indicated the name "Skeet" from apartment 2D, as a possible suspect. At around 9:35 a.m., Newark policemen came onto the scene. Officer Alfred Rizzolo questioned Broadway [a friend of the victims who had also been shot] who told him that "Skeet" had shot her while she was at apartment 2E at 7 Chestnut Street in East Orange and that there were two dead persons in that apartment. At 9:40 a.m., Officer Michael Brown of the East Orange Police Department received a radio dispatch reporting a double homicide in apartment 2E at 7 *454 Chestnut Street. Additionally, the dispatch indicated that "Skeet," who was the person allegedly responsible for the shootings, might be found in apartment 2D. Brown immediately went to the apartment building where he was joined by two other policemen, and the three officers then entered the building.
When the officers arrived, they entered apartment 2E and saw blood in the inner hallway. In the bedroom, they found the dead bodies of Estella and Charlene [Moore]. Officer Brown noted, however, that the bodies were still warm, which indicated to him that the shootings were recent. Based on the dispatcher's prior information that the person responsible for the shootings might be in apartment 2D, the officers left the Moores' apartment thereby positioning themselves directly in front of defendant's door.
The door to apartment 2D was ajar, and the three officers entered the apartment together. The officers remained inside the apartment for a few minutes, looking for a murder suspect and weapons but found neither. Other officers and medical personnel then began to arrive on the scene. Captain John Armeno of the East Orange Police Department arrived around 10:00 a.m. and entered apartment 2D for the purpose of searching for weapons or "any other thing of evidentiary value." On a shelf Armeno found a photograph of defendant which he took because he thought it might be a picture of "the individual who lived in that apartment and the one we might be seeking." Because there had been a double homicide where the killer was still at large and no weapon had been found, Armeno thought that it was important to identify the killer quickly and he felt that the photograph would be helpful in that pursuit.
Armeno gave the photograph to Detective Sergeant Alan Sierchio advising him that "the person depicted in the photograph might possibly be the person who shot the two young ladies." In turn, Sierchio gave the photograph to Sergeant Ronald Sepe with instructions to show it to Broadway as soon as possible and to interview her if possible. Prior to Sepe's departure, the photograph was shown to the building manager, Jeanette Peace, who stated that defendant, was known as "Skeet," lived in apartment 2D and the photograph was of defendant.
Armeno remained in defendant's apartment for about twenty minutes. During that period and possibly beyond, an undetermined number of police officers walked through the apartment, ostensibly looking for a suspect, a weapon, or a means of identifying the occupant of the apartment. Sierchio characterized his and the other officers' activities in apartment 2D that morning as merely "looking around," not as a "questing search" for evidence. Significantly, while looking around defendant's apartment that morning Sierchio observed drug paraphernalia on the kitchen table in plain view.
Meanwhile, when Sepe arrived at the hospital, he found Broadway lying on a stretcher in the emergency room. She had been intubated and was having difficulty speaking. An attending physician told Sepe that Broadway was in "critical condition." Sepe asked Broadway whether she knew the person or persons responsible for the shootings. Broadway nodded in the affirmative and spoke the name "Skeet." Sepe then showed the photograph of defendant to Broadway and asked her whether the pictured person was the one responsible for the shooting. Broadway nodded in the affirmative and began to cry. Sepe went back to the Moores' apartment where he reported Broadway's identification of defendant to Sierchio.
Later that afternoon, Sierchio and Sepe appeared before Judge Yale Apter, who signed an arrest warrant for defendant's arrest prepared by Sierchio. On *455 August 8, Detective John Lee prepared a warrant for the search of defendant's apartment.
....
Later that afternoon, Judge Apter signed the warrant, and Lee and other police officers seized various drug paraphernalia and cocaine, all found on or near the kitchen table in plain view. The police also seized an empty black leather handgun holster, a beige Rolodex file with cards on which names and information were written and two black leather fighting gloves called "cestus." The Rolodex and cestus were located in plain view. The holster, however, was not readily visible, as it was located under some clothing on a kitchen chair. Evidently, the Rolodex file contained information which eventually led the police to the location where defendant was ultimately found.
The next day police officers from East Orange and Newark went to the third-floor apartment of Irving Gaskins at 31 North 13th Street in Newark. The officers knocked on the door of Gaskins's apartment and asked for "Irv," who they thought might be a "close associate" of defendant. The police officers were admitted to the apartment by a woman, who pointed toward defendant where he was sitting on a couch in the living room. Gaskins, who was elderly and in poor health, was apparently seated nearby in the same room. Defendant stood up and identified himself to the police, who told him that they had a warrant for his arrest. A pat-down search of defendant's person revealed a fully loaded, six-shot Spesco Taurus .38 caliber revolver in his waistband and five additional.38 caliber cartridges in this right front pants pocket. Defendant was then taken into custody. At trial, it was stipulated that defendant did not have a permit to carry a handgun.

Subsequent examination of the revolver seized from defendant and of the bullets recovered both from the victims' bodies and at the crime scene revealed that the fatal rounds had been fired from this revolver. Additionally, at trial, the State's ballistics expert stated that the particular model of revolver seized from defendant had unique striation marks cut into the flutes of the outside cylinder walls. This was significant because the State argued at trial that those unique striation marks were plainly visible in the black leather holster seized during the search of defendant's apartment. (Emphasis added; footnote omitted.)
In our opinion we also noted the factual background for the speedy trial claim:
After defendant was arrested on August 9, 1987, a public defender was appointed to represent him, but there was a question of defendant's right to a public defender. On November 18, 1987, when defendant entered a plea of not guilty, the State served a notice of aggravating factors on defendant, thereby indicating the State's decision to seek the death penalty. On January 21, 1988, the Public Defender's Office notified defendant that it would no longer represent him because he did not qualify as an indigent. Prior to that time, the Public Defender's office interviewed no more than four witnesses. Through a series of errors, defendant had difficulty appealing the denial of free counsel (partially because of erroneous information given defendant).
Defendant objected to the denial of a public defender, and following hearings on February 2 and 16, August 18, and October 12, 1988, Judge Joseph A. Falcone determined that defendant was indeed indigent. On or about October 20, 1988, the judge sent a letter to the Public Defender's Office instructing it to represent defendant again. This means that defendant was apparently without legal representation for about nine months following his indictment. Shortly after October 20, Assistant Deputy *456 Public Defenders Albert Kapin and Joseph Krakora were assigned to represent defendant. There are many factual issues surrounding this period including the actions of Criminal Case Manager Anthony Casale.
In early 1989, Kapin moved for a reduction in defendant's bail. On April 21, 1989, Judge Falcone denied this motion and set September 18, 1989 for defendant's trial, but the trial did not actually begin until September 11, 1990. On various dates between September 6 and October 17, 1989, Kapin and Krakora argued pretrial motions involving identification, search and seizure and other issues. Judge Falcone directed the attorneys to appear before him on October 26 for his decision, but the judge did not decide the motions on October 26. On December 21, 1989, Kapin and Krakora sent a letter to Judge Falcone requesting that he set a date to decide the motions and to set a new trial date. According to the attorneys, their ability to prepare for trial was being hampered by their uncertainty concerning the motions and the trial date.
According to defendant, in December 1989 and January 1990, he requested that Kapin and Krakora file a motion alleging that the delay in deciding the motions was violative of his constitutional right to a speedy trial. Defense counsel apparently did not act on this request.
The judge apparently also did not respond to the defense attorneys' letter of December 21, 1989. Consequently, on February 2, 1990, Kapin and Krakora filed a motion to set a trial date and to reduce defendant's bail. In the affidavit accompanying the notice of motion, the attorneys alleged that the delay in deciding the pretrial motions and in setting a trial date had prejudiced defendant in several ways including the death of a potential defense witness, Gaskins, in September 1989. The record does not indicate when these motions were argued, but the judge entered an order setting the trial date as September 10, 1990. This order did not address defendant's other pretrial motions and it was not until May 18, 1990, that Judge Falcone issued his comprehensive oral decision denying all of defendant's pretrial motions to suppress certain evidence and to preclude certain identification testimony.
Defendant insists that the delay of approximately nine months in obtaining counsel severely prejudiced his case, that the prejudice was attributable to the State or its Public Defender, and that the excessive time between arrest and trial denied his constitutional right to a speedy trial. The issue was developed at the PCR hearing before the trial judge, and the judge rendered a lengthy and comprehensive oral opinion detailed hereinafter in Point III. The State acknowledges that the record supports the judge's essential findings of fact, the highlights of which we hereinafter recite. However, notwithstanding the detailed findings of fact, we are satisfied that a balancing of the relevant factors under the controlling Supreme Court precedent requires reversal of his legal conclusion.

III.
After conducting a financial investigation regarding Public Defender (PD) eligibility, the PD wrote defendant, on January 21, 1988, that he was ineligible for representation by that office. The letter stated that:
In August of 1987, a similar house next to yours, 156 Pearson Street, Orange, N.J., was sold in August 1987 for $90,000. Our investigation reveals that 200 Pearson is listed by the Brokers for $125,000. Our investigation has revealed that your house, according to reliable information from Real Estate Bokers in the area, has a market value of between $70,000 and $110,000, depending upon its condition.
*457 The letter also addressed a pending civil action in which defendant had an expectation of recovery, and concluded that:
Based upon the information re: your ownership of the aforementioned property, this office is denying your request for its services in the pending matters in which you are a Defendant. Please be advised that you have the right to appeal to the Appellate Division which has exclusive jurisdiction in this matter. See State v. Nilsen, 214 N.J.Super. 23, 518 A.2d 240 [ (App.Div.1986) ].[3]
On February 2, 1988, when defendant appeared in court without counsel, the judge who was then presiding over the case, "after referring to the right of appeal as set forth in the letter," questioned defendant as to whether he would appeal the PD determination. Defendant responded in the affirmative, noted the difficulties he had in obtaining access to the library due to his incarceration, and stated that the had not yet reviewed the Nilsen case. The judge scheduled another appearance two weeks later in order to track defendant's progress with the appeal and the retention of counsel. The matter was apparently monitored, but nothing of substance occurred for several months, although a regional Assistant Deputy PD asked its Appellate Section to assist defendant to perfect his challenge to the determination of non-indigency. On March 21, 1998, a status conference was held at which it was noted that there was still "no response re appeal by defendant," and the court was going to "reach out and check status of appeal." When defendant next came before the court on April 19, 1988, the court supplied defendant with a copy of State v. Nilsen.[4]
On May 16, 1988, defendant wrote to Public Defender Alfred Slocum. The letter stated that defendant had heard nothing from the PD's Appellate Section, that defendant was having a hard time obtaining stamps or envelopes, and that the copy machine was broken. Included with the letter was "a handwritten note" which was written in his presence by a regional Assistant Deputy PD which stated "Public Defender's Office has frustrated defendant's attempts to prepare for the trial of this case." It further noted that the PD failed to take statements of three individuals whose names were provided to the PD by defendant.
PD Slocum responded to defendant's letter on June 20, 1988. Referring to the then recent amendment to N.J.S.A. 2A:158A-2, he wrote that:
Effective April 5, 1988 by virtue of newly enacted legislation, the Office of the Public Defender was relieved of the responsibility of determining indigency. This determination is now made by the judiciary. Even if you were to successfully appeal Mr. Winograd's determination, the Office of the Public Defender would not be able to decide whether you are indigent or not.
You should immediately write to the Essex County Criminal Case Manager requesting that they provide you with an application for representation by the Office of the Public Defender. If they determine that you are eligible for our services, we will again undertake your representation.
In a letter received by the judge on August 12, 1988, defendant blamed the regional Assistant Deputy PD formerly assigned to his case for providing him with misinformation concerning the appellate process. Additionally, this letter said "I would like to exercise my right to have adequate representation in this matter," *458 and reminded the court that he had been "incarcerated at the Essex County Jail for one year ... [and] without representation for approximately seven months."
On August 18, 1988, defendant appeared in court and Probation Officer Frank Caporale was directed to assist defendant in completing the proper form 5A requesting the assignment of counsel. The officer reported to the PD that defendant was "conditionally eligible for public defender representation."
However, on August 26, 1988, defendant was visited by Anthony Casale, the Criminal Case Manager, who, according to defendant, informed him that based on the information in the PD's January 21, 1988 letter, defendant was still "ineligible" for representation by the PD. Casale further informed defendant that he would ask an attorney to assist him in obtaining representation.
During the meeting with Casale, defendant told him that his house had been "severely" damaged by "a fire in February of 1985 and was uninhabitable." Casale stated that he would examine the matter further. Defendant thereafter sent the presiding judge photographs of the property, and on September 20, 1988, the judge ordered Casale to proceed with a new eligibility investigation. Ultimately, in court proceedings conducted on October 12, 1988, it was determined that defendant was indigent and entitled to representation by the Office of the Public Defender. The PD was so advised on October 20, 1988.
On November 2, 1988, two assistant deputy public defenders were assigned to the case, and on March 28, 1989, defendant filed a motion to set "the dates for the filing and hearing of all pretrial motions and for trial." Defendant also moved to reduce bail.
A pretrial conference was held on April 3, 1989,[5] at which time a hearing on all motions to be filed was scheduled for August 7, 1989. Trial was tentatively scheduled to commence September 18, 1989. In the interim, defense counsel filed briefs on the motions.
The hearing of pretrial motions commenced September 6, 1989 and continued into October. On November 22, 1989, the PD received a letter from Michael and Sheila Tucker, two defense witnesses, informing them that they were moving to Australia. By letter dated December 21, 1989, the PD requested that the court "set a schedule for the remaining hearings on the pretrial motion and a date for the jury selection," in order for the defense to schedule bringing the two witnesses back. A formal motion to that effect was filed on February 22, 1990.
Because of its significance, we asked the Clerk of this court to obtain a copy of the February 22, 1990 motion. It was entitled "Notice of Motions to Set Trial Date and Reduce Bail." The affidavit of counsel accompanying the motion reads in its entirety:
1. We represent the defendant Robert Douglas in this case.
2. This case has been pending since defendant's arrest on August 8, 1987. Defendant has been held in the Essex County Jail since that time in lieu of $500,000 bail. As of February 19, 1990, no dates have been set for the remaining pretrial hearings or for jury selection. By letter dated December 21, 1989, we requested that dates be set, but no response to that letter has been received.
3. In addition to the prejudice resulting from defendant's continued pretrial incarceration, we assert that the ongoing delay in this case has prejudiced him in the following ways:
a) Two defense witnessesSheila and Mickey Tuckerhave moved to Australia.
*459 b) One potential defense witnessIrving Gaskinsdied in September, 1989.
c) Without knowing the Court's rulings on the pretrial motions, we have been unable to finalize trial strategy.
d) We are unable to give our fact and character witnesses any guidance as to the timing of the trial and we fear that it will be increasingly difficult to enlist their cooperation.
e) There is a strong possibility that the trial will be further delayed in the event either side takes interlocutory appeals from the Court's rulings on the pretrial motions.
f) Such a long delay between arrest and trial may create the impression to the jury that the defendant's guilt is not really at issuejust the punishment to which he should be subjected.
4. We respectfully request that a trial date be set and that defendant's bail be reduced. (Emphasis added.)
On the March 9, 1990 return date, an order was entered granting the "motion for trial date certain," and a trial date was scheduled for September 10, 1990.
On May 18, 1990, the presiding judge decided the pretrial motions. He also announced that he had been reassigned and that the case was being reassigned to the judge who tried the case and later heard the PCR. After other issues were resolved, the trial commenced on October 30, 1990, although the parties agree that jury selection actually commenced on September 10, 1990.[6]

IV.
One of defendant's trial attorneys testified at the PCR hearing. He was asked whether he had ever filed a "speedy trial motion." He responded that the February 22, 1990 motion "was basically the same" and that "we wanted a speedy trial date, we wanted the case to move forward."[7] According to the attorney, in his motion papers defendant claimed potential prejudice because of the Tuckers' move to Australia, Irving Gaskin's death, the fact that without motion rulings and a trial date they were unable to formulate trial strategy, and that "[t]here is a strong possibility that the trial will further be delayed in the event any side takes an interlocutory" appeal. However, he further testified that
As to A we were able to obtain the presence of Shiela and Mickey Tucker. We flew them back from Australia. It is true that Irving Gaskins died. We were concerned about finalizing our trial strategy and obviously that came into the picture after the rulings were made. Once a trial date was set, we were able to give our witnesses a time table and once the ruling was made and there were no interlocutory appeals he [apparently referring to Gaskins] wasn't as much a problem.
On cross-examination at the PCR hearing, trial counsel testified that given the nature of a capital case and the time they take to try, "it didn't seem practicable to try the case over the summer," and he did not object to the September 1990 trial date. He also testified that although a motion for dismissal on speedy trial grounds could have been filed as an alternative to the motion filed, he did not think such a motion "would have been granted," and he was more concerned with the "practical reality" of getting a trial date set. Additionally, he testified that such an *460 alternative would have required a revelation of "trial strategy" as a basis for asserting prejudice and "would have given information to the state" which it otherwise "would not have been entitled to know at that time."
With regard to the length of pretrial incarceration, the attorney, who had been involved in prior capital cases, further testified that in his experience "2-to-3 year periods of preparation is not uncommon" and was necessary "in the ordinary course."
Concerning the time taken by the first judge to decide the motions, counsel testified that the defense was "still preparing the case by way of penalty phase investigation and that investigation does not end with motions."

V.
Whether a defendant is denied his federal constitutional right to a speedy trial is governed by a flexible four-part balancing analysis established in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The same test applies to a claim under New Jersey law. State v. Szima, 70 N.J. 196, 199-201, 358 A.2d 773, cert. denied, 429 U.S. 896, 97 S.Ct. 259, 50 L.Ed.2d 180 (1976). The factors which must be balanced to evaluate a speedy trial claim are: (1) length of delay; (2) reason for delay; (3) defendant's assertion of his right; and (4) whether defendant was prejudiced by the delay. Barker, supra, 407 U.S. at 530-32, 92 S.Ct. at 2192-93, 33 L.Ed.2d at 116-18; Szima, supra, 70 N.J. at 201, 358 A.2d 773. None of these factors is regarded as "either a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial. Rather, they [are] to be treated as related factors to be considered with such other circumstances as may be relevant." Szima, supra, 70 N.J. at 201, 358 A.2d 773; see also Barker, supra, 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. Therefore, the "application of a balancing of interests test must be on an ad hoc basis and necessarily involves subjective reaction to the balancing of the circumstances." Szima, supra, 70 N.J. at 201, 358 A.2d 773.
Defendant's right to a speedy trial attached upon his arrest. Dillingham v. United States, 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975).[8] Therefore the Barker analysis begins with consideration of whether the period of time between the arrest and trial has "crossed the threshold dividing ordinary from `presumptively prejudicial' delay." Doggett v. United States, 505 U.S. 647, 651-52, 112 S.Ct. 2686, 2690, 120 L.Ed.2d 520, 528 (1992); see also Barker v. Wingo, supra, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117; United States v. MacDonald, 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696, 703 (1982); State v. Long, 119 N.J. 439, 469, 575 A.2d 435 (1990).
Here it took more than three years following arrest to commence the jury selection. However, this was a capital prosecution, and a three-year delay does not by itself give rise to prejudice or denial of the right to speedy trial. See State v. Long, supra, 119 N.J. at 469, 575 A.2d 435. In fact, a Commission appointed by the Governor recently reported on issues stemming from the fact that capital cases in New Jersey are generally not tried for two years following indictment. Report of Governor's Study Commission on the Implementation of the Death Penalty at 11. And, as the Public Defender noted in her dissent from that report, the lengthy period is often required by the defendant to prepare a list of mitigating factors before the guilt phase is tried. See dissent at 11-12. This view is supported by existing rules because, in the event of a finding of guilt, defendant must serve them immediately *461 upon entry of the verdict. See R. 3:13-4(b).
One of the defense counsel in this case so indicated in his PCR testimony and suggested that his client, whose life was spared at the penalty phase, would have been prejudiced by a likely unsuccessful motion to dismiss on speedy trial grounds because of what would have had to be revealed in terms of contemplated trial strategy. Furthermore, defense counsel testified that after getting into the case, he used the time before trial commenced to investigate the matter and prepare for trial. All pretrial time was productively used once defense counsel were assigned, and when they asked that a trial date be set, it was fixed in accordance with a schedule satisfactory to the defense.
The Barker court emphasized that "the failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial," 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118,[9] and distinguished the relative weight to be given to a "deliberate attempt to delay the trial in order to hamper the defense" and a more "neutral" reason such as negligence or an overcrowded court calendar. Barker, supra, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. The former is to be weighed more heavily for a defendant, even though no matter the reason for delay, "the ultimate responsibility" for bringing the case to trial "must rest with the government." Ibid.
Here, the PCR judge placed much of the weight in the balance upon the PD's withdrawal of representation, and notwithstanding the 1987 amendment to N.J.S.A. 2A:158A-2, the defendant was told he had to proceed with an appeal from the PD's decision on eligibility even after the effective date of the amendment giving the Judiciary responsibility for determining PD eligibility. The 1987 amendments to the Public Defender statute, N.J.S.A. 2A:158A-2, et seq., adopted in July 1987 and effective April 3, 1988 (see L. 1987, c. 170, § 8)just about two and-a-half months after defendant was found ineligible for PD representationshifted responsibility for determining eligibility for a public defender from the PD to the Judiciary. The amendment further provided that once in effect, the determination of the Judiciary was subject to final review by the Assignment Judge or his assignee. N.J.S.A. 2A:158A-15.1.[10]
Whether or not the 1987 amendment was retroactive would not have affected defendant's obligation to appeal the PD determination made before its effective date in April 1988.[11] Nor did the delayed effective date excuse the Judiciary's failure to be more aggressive in reviewing defendant's claim of indigency, at least after that date. But in no event can it be said that advising defendant of his need to pursue an appeal and reliance by the courts and PD on that requirement, as required by law at the time of the PD's decision, was a deliberate attempt to hamper the defense.
More significantly, we see nothing in the record to suggest that defendant was unduly prejudiced by the delay which can be attributable to the assignment of counsel at the outset of capital proceedings. Such proceedings would have, of necessity by virtue of the needs of the defense team in a capital case, carried beyond the death of Irving Gaskins or any other event which defendant points to as the basis for his claim of prejudice. And as the defendant's appellate counsel candidly acknowledged at the argument before *462 us, no motion for speedy trial was made earlier, probably to maximize the time needed to prepare for a possible penalty phase, and when defendant did request a specific trial date in his February 22, 1990 motion, it was essentially to make sure there was time to arrange for the Tuckers to return from Australia. That motion was granted. A date was scheduled in response to the motion, the record reflects no motion to dismiss on the basis that the date certain was violated (see R. 3:25-2; State v. Coolack, 43 N.J. 14, 16, 202 A.2d 422 (1964) (pre-Barker)), the Tuckers were present for trial, and defense counsel utilized the intervening time to prepare their case.
Defendant notes that his February 1990 motion, which referred to possible prejudice if a trial date were not set, included a reference to Irving Gaskins' death. But Gaskins had died months before the motion was filed. The PCR judge nevertheless found it significant that no PD investigator interviewed Gaskins until twenty-three months after the crime, in July 1989. The investigator's report indicated that Gaskins stated that "he did not see Mr. Douglas with any weapons."[12] However, this interview took place nine months after representation by the PD recommenced and over seven months prior to the February 1990 motion. In the interim, there was no endeavor to take Gaskins' deposition, see R. 3:13-2, even though the PCR judge noted that he "did not find there was ineffective assistance of counsel" with respect to the preservation of Gaskins' testimony or otherwise.
In any event, any prejudice concerning Gaskins' death is merely speculative. As the PCR judge himself said, he could not figure out, and had no way of knowing, "whether or not Mr. Gaskins would have held up under cross-examination," even if his deposition had been taken.
In its brief before us, the State contends that the matter should be remanded for an additional hearing in the event that we find defendant's arguments persuasive. According to the State:
In order to sharpen the ability of the Law Division or this court to resolve defendant's speedy trial claim, it would be helpful to know if indeed counsel intended to call Gaskins as a witness....
At oral argument we asked defense counsel his view about the suggestion and whether it would be desirable to remand to explore the details regarding what Gaskins told the Public Defender investigators, whether counsel would have called Gaskins as a trial witness if he survived and why no request was made for a deposition under R. 3:13-2 before Gaskins' death. Defense counsel indicated that no remand would be appropriate and argued that both parties were bound by the record they have already made. We agree with defendant's view that counsel were obligated to present their witnesses in support of all factual contentions at the hearing. However, given the identification of defendant by Ms. Broadway, the testimony of all the officers that defendant had a loaded handgun in his possession at the time of his arrest in the Gaskins apartment, and the discovery of the holster in defendant's apartment, all as detailed in our opinion on the direct appeal, we conclude that Gaskins' death (coming as it did after the Public Defender's interview without an endeavor to preserve his testimony, the nature of Gaskins' *463 statement regarding what he did not see without a fuller explanation of what he did observe, and the giving of that statement long before a motion was made to fix a trial date) does not warrant the granting of post-conviction relief on the grounds that defendant was prejudiced by virtue of the pretrial delay.

VI.
The order granting post-conviction relief is reversed.
NOTES
[1] Defendant's attorney elected not to file a brief in support of the pro se cross-appeal because defendant was incarcerated pending the State's appeal and counsel did not want to "further delay this litigation." The State did not respond to the cross-appeal.
[2] This background is not disputed. We have not been presented with the trial transcripts although the State's brief refers to portions thereof by way of background and portions were read into the record at the PCR hearing. We also have a list of dates on which proceedings were conducted and transcripts were ordered for purposes of the direct appeal. Other filed documents of public record have also been obtained by the clerk, in addition to those provided in response to our request for the February 22, 1990 motion discussed infra. We have used those documents to assure the accuracy of quotations from material referred to in the record. In any event, as hereinafter developed, we accept the PCR judge's essential findings of fact as detailed in his opinion and as set forth in Point III of this opinion.
[3] Nilsen provided that "[i]f the rejected applicant wishes to contest the rejection, he or she should file an appeal with the Appellate Division pursuant to R. 2:2-3(a)(2)." Id. at 27, 518 A.2d 240.
[4] As the PCR judge noted, by this date the Judiciary was responsible for indigency determinations, "[n]o mention of this was made to the defendant [and][t]he Court did not on its own make any attempt to determine indigency."
[5] In the interim defendant wrote a letter of complaint about the PD's handling of the question of his representation and the prejudice caused by his lack of representation for nine months.
[6] We have sent for the docket sheet in this case and obtained a copy of the PROMIS/GAVEL printout. It does not help us to identify specific motions or trial dates. However, the list of transcripts at the outset of defendant's brief on this appeal and the direct appeal reflect that the first jury selection transcript was dated September 11, 1990.
[7] On the direct appeal, we noted:

According to defendant, in December 1989 and January 1990, he requested that Kapin and Krakora [his PD trial attorneys] file a motion alleging that the delay in deciding the motions was violative of his right to a speedy trial. Defense counsel apparently did not act on this request.
[8] In light of the short time between the offense and arrest, no Fifth Amendment due process claim is asserted.
[9] However, the fact of incarceration pending trial by itself may affect the prejudice factor. Ibid.
[10] The new system was continued as amended by L. 1998, c. 77, § 2, effective August 14, 1998.
[11] The Administrative Office of the Courts was to develop an experimental program under the new law within thirty days of adoption in July 1987. See L. 1987, c. 170, § 5; N.J.S.A. 2A:158A-15.2.
[12] The investigator's written report was dated February 23, 1993, and indicated that the interview was conducted to obtain information "that could be used in the Penalty Phase" of the trial. It indicated that Gaskins thought the "officers who had come to arrest Mr. Douglas came there with the intention of shooting Mr. Douglas"; that Gaskins was "adamant" that defendant "could not have committed the crime," and that Gaskins was "willing to tell the judge what he knows about Mr. Douglas." The report also noted that "Mr. Gaskins was at the time [of the interview] suffering from a number of ailments including [ ] emphysema, asthma, and heart failure. He was hooked up to an oxygen machine, and had difficulty talking for prolonged periods due to `shortness of breath.'"