

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-8-2006

# Douglas v. Cathel

Precedential or Non-Precedential: Precedential

Docket No. 03-3162

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Douglas v. Cathel" (2006). *2006 Decisions.* Paper 535.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/535

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-3162
_____

ROBERT E. DOUGLAS,
                                        Appellant
                        v.

*RONALD H. CATHEL, Administrator of New Jersey State
Prison;
THE ATTORNEY GENERAL OF THE
STATE OF NEW JERSEY, ZULIMA FARBER[*]

*Amended, See Clerk's Order dated 10/25/05
_____

On Appeal from the United States District Court
for the District of New Jersey
D.C. Crim. Action No. 99-cv-05642
(Honorable William H. Walls)
_____

Argued April 25, 2006

Before: FUENTES, STAPLETON, and ALARCÓN,[**] *Circuit
Judges*

(Filed: August 8, 2006)
_____

_____

[*]Zulima Farber is automatically substituted as Attorney
General of the State of New Jersey pursuant to F.R.A.P.
43(c)(2).

[**]The Honorable Arthur L. Alarcón, Senior Judge, United
States Court of Appeals for the Ninth Circuit, sitting by
designation.

Mary Gibbons (Argued)
600 Mule Road
Holiday Plaza III
Toms River, NJ 08757

      Counsel for Appellant

Barbara Rosenkrans (Argued)
Office of County Prosecutor
Essex County
50 West Market Street
New Courts Building
Newark, NJ 07102

      Counsel for Appellees

OPINION OF THE COURT
_____

ALARCÓN, *Circuit Judge*.

Robert E. Douglas appeals from the order denying his *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Mr. Douglas contends that the District Court failed to apply the correct standard of review pursuant to the terms of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). He also argues that his Sixth Amendment rights were violated because (1) he was denied a speedy trial, (2) his counsel was ineffective for failing to pursue his right to a speedy trial, and (3) he was effectively denied his right to counsel because he was unrepresented at a critical stage of the proceedings while he was in custody on capital charges. We will affirm because we conclude that the District Court applied the correct standard of review in determining that the Appellate Division's decision was not "contrary to, [or did not involve] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

**I**

On August 7, 1987, Estella and Charlene Moore lived together with Charlene's infant daughter in Apartment 2E in a

building in East Orange, New Jersey. Mr. Douglas, whose nickname is "Skeet" lived next door to the Moore sisters in Apartment 2D. Georgianna Broadway and Deborah Neal lived together nearby in Newark, New Jersey. Ms. Broadway and Ms. Neal were friends of the Moore sisters. Ms. Broadway was introduced to Mr. Douglas through the Moore sisters.

In late July or early August of 1987, Ms. Broadway had lunch with the Moore sisters at their apartment. She stayed about forty-five minutes. Mr. Douglas was also in Apartment 2E at the same time. After repairing the front door of Apartment 2E, Mr. Douglas and the Moore sisters sat in the living room area conversing and consuming mixed drinks. Ms. Broadway sat approximately twenty feet away in the kitchen area listening to Mr. Douglas's conversation with the Moore sisters as she ate her lunch.

On the evening of August 7, 1987, Ms. Broadway visited the Moore sisters in Apartment 2E. At approximately 5:30 a.m. on August 8, 1987, Charlene Moore and Ms. Broadway went to sleep in the bedroom. Mervin Matthews, a friend of the Moore sisters, arrived at their apartment building at around 6:00 a.m. to drop off Estella Moore's keys and cigarettes. As he approached the building, Mr. Matthews saw Mr. Douglas standing outside the entrance talking to another gentleman. Mr. Matthews greeted Mr. Douglas. The two men went upstairs together; Mr. Matthews entered the Moores' apartment, while Mr. Douglas entered his own apartment. About fifteen minutes later, when Mr. Matthews left the Moores' apartment, Mr. Douglas also exited his apartment and joined Mr. Matthews as he walked down the stairs. When Mr. Matthews left that morning, Mr. Douglas was standing outside the apartment building.

Kenneth Hampton, an acquaintance of Mr. Douglas's who needed a place to stay, spent the night of August 7, 1987 at Mr. Douglas's apartment. At around 6:45 a.m. or 7:00 a.m., Mr. Hampton left the apartment to go outside and catch a ride to work. He saw Mr. Douglas sitting alone on the front stoop of the apartment building. The two men spoke briefly and Mr. Hampton ran to the corner to catch his ride.

Ms. Broadway awakened some time around 7:00 a.m. or 7:30 a.m. and heard Estella Moore speaking to Mr. Douglas in the kitchen area. Ms. Broadway asked Charlene Moore to bring her

3

Ms. Broadway's pocketbook and keys from the kitchen. Charlene Moore complied. Ms. Broadway asked Estella Moore to prepare a meal for her. Estella Moore brought Ms. Broadway a tray of Chinese food. Ms. Broadway noticed that Estella Moore had "a very scared look on her face" when she entered the bedroom. Ms. Broadway asked Estella Moore "what was wrong." Estella replied, "Nothing. Nothing."

A few minutes later, the bedroom door was pushed open and six shots were fired in rapid succession. Ms. Broadway did not see the perpetrator. She received bullet wounds under her chin and on her right arm. She also was grazed by bullets on her chest and thumb. The Moore sisters died instantly from close range bullet wounds. After determining that the sisters were dead, Ms. Broadway saw the baby's foot move. The baby was unharmed. Ms. Broadway placed the baby inside her coat.

Ms. Broadway waited for up to thirty minutes to leave the apartment building because she was unsure of the perpetrator's whereabouts. She drove herself to her residence. When she entered the apartment, she told Ms. Neal: "Skeet just shot all three of us and Stella and Charlene is [sic] dead." Ms. Neal telephoned the East Orange Police Department to report the homicides. She indicated that "Skeet," the occupant of Apartment 2D, was a possible suspect.

Officer Alfred Rizzolo arrived at Ms. Broadway's residence at 9:35 a.m. on August 8, 1987. Ms. Broadway was being treated by emergency medical service personnel. She appeared to be nervous, excited, and in a lot of pain. Ms. Broadway told Officer Rizzolo that "Skeet" had shot her while she was at Apartment 2E and that "there were two dead bodies in that apartment."

Sergeant Michael Brown, Officer Ronald Tisdale, and Officer Ben Powell of the East Orange Police Department responded to the dispatcher's call about a double homicide in Apartment 2E. Sergeant Brown was also informed that the perpetrator might be in Apartment 2D. Finding the door of Apartment 2E ajar, the officers entered and discovered Estella and Charlene Moore lying on the bedroom floor. Each of them had multiple gunshot wounds. The officers did not find any other person or weapons in the bedroom. They recovered a round of ammunition under a radiator in the bedroom.

4

The officers discovered the door of Apartment 2D ajar. They entered in order to perform a plain-view search for weapons and/or persons. Captain John Armeno of the East Orange Police Department arrived at Apartment 2D at 10:00 a.m. He conducted a search for weapons or "any other thing of evidentiary value." He believed it was important to identify the perpetrator quickly. Captain Armeno removed a photograph of a man from Apartment 2D. The building's manager identified the man in the photograph as Mr. Douglas.

Sergeant Ronald Sepe of the East Orange Police Department took the photograph to the University Hospital where Ms. Broadway was being treated for her gunshot wounds. Sergeant Sepe showed the photograph to Ms. Broadway and asked her if the man in photograph was the person who shot her. Ms. Broadway nodded her head and told Sergeant Sepe: "Yes."

Warrants for the arrest of Mr. Douglas and the search of his apartment were executed later that day. The search of Mr. Douglas's apartment yielded "[a]n Ohaus tripple beam scale, a Derring gram scale, one hand held scale, glass bowl pipe, single edge razor, one spoon with residue, another spoon with residue, one bag of suspect marijuana, one bag of suspect marijuana seed, one pack of suspect cocaine, one black leather holster, two black leather cestus and one beige Rolodex file." The Rolodex included the name Irving Gaskins.

The next day, on August 9, 1987, eleven police officers went to Mr. Gaskins's apartment in Newark, New Jersey to locate Mr. Douglas. Sergeant Sepe, Sergeant Alan Sierchio and four other police officers from the East Orange Police Department, were assisted by Sergeant Charles Whitner of the Newark, New Jersey Police Department Tactical Unit; Officer Wayne Dooley, Officer George Davey and Officer Thomas Hughes, also of the Newark Police Department. Sergeants Sepe, Sierchio and Whitner, along with Officers Hughes, Dooley and Davey, walked up to the third floor apartment. Sergeant Whitner knocked on the door. They were admitted by Bonita Allen who indicated that Mr. Douglas was in the living room.

Upon entering the apartment, the officers observed Mr. Douglas sitting on the couch in the living room. Sergeant Sepe, Sergeant Whitner, Sergeant Sierchio, and Officer Dooley

approached Mr. Douglas in the living room. Mr. Douglas stood up as the officers approached him. Mr. Gaskins was seated in the living room on a chair near the couch. Sergeant Sepe placed Mr. Douglas under arrest. Sergeant Whitner handcuffed Mr. Douglas from behind while Sergeant Sepe, who was face-to-face with Mr. Douglas, performed a protective search. When searching Mr. Douglas, Sergeant Sepe came across a hard object and announced that he had found a gun. Sergeant Sierchio moved in closer and observed Sergeant Sepe lift Mr. Douglas's shirt and seize a fully loaded six shot Spesco Taurus .38 caliber revolver from "the front portion of his pants in the waistband area." The six rounds in the weapon were hollow-point bullets. Sergeant Whitner, Officer Hughes, and Officer Davey also observed Sergeant Sepe remove the weapon from Mr. Douglas's waistband area. Sergeant Sierchio observed Sergeant Sepe remove an additional five rounds of ammunition, also hollow-point bullets, from Mr. Douglas's right front pocket. Prior to patting him down, Sergeant Sepe did not see the weapon or a bulge in Mr. Douglas's pants. The weapon was entirely concealed from view because Mr. Douglas's shirt was hanging down over his waistband.

The gun holster located in Apartment 2D bore unique striation marks matching those found on the weapon recovered from Mr. Douglas at the time of his arrest. Captain Carl Leisinger, a ballistics expert, testified that the bullets recovered from the bodies of the Moore sisters and the spent round recovered in Apartment 2E were fired from the revolver carried by Mr. Douglas at the time of his arrest. Captain Leisinger also testified that the revolver seized from Mr. Douglas had unique striation marks cut into the flutes of the outside cylinder. This is the only revolver Captain Leisinger had seen, in examining tens of thousands of revolvers, that had this particular type of fluting. These unique striation marks were plainly imprinted on the black leather holster found in Mr. Douglas's apartment.

## A

Ollie Douglas, an Assistant Deputy Public Defender ("ADPD") with the New Jersey Office of the Public Defender for Essex County ("OPD"), was appointed to represent Mr. Douglas on August 12, 1987, three days after he was arrested. At the time of his appointment to represent Mr. Douglas, ADPD Douglas had

served as an Assistant Deputy Public Defender for fourteen years. He had tried two or three capital cases. After interviewing Mr. Douglas, ADPA Douglas requested that a field investigation be conducted, rather than telephone contacts, with several individuals whom Mr. Douglas disclosed might be witnesses to support his defense. The list of prospective witnesses that Mr. Douglas suggested should be questioned in person included Mr. Gaskins, Sheila Tucker, and Michael Tucker.

On October 14, 1987, Mr. Douglas was charged with two counts of murder, aggravated assault, possession of a handgun without a permit, and possession of a firearm for an unlawful purpose in violation of New Jersey law. ADPD Douglas represented Mr. Douglas at his arraignment on November 18, 1987. Mr. Douglas entered a not guilty plea. Pursuant to N.J. Ct. R. 3:7-3(c), the State served a notice of aggravating factors which, if proven at the penalty phase, would make Mr. Douglas eligible for the death penalty. Deputy Public Defender ("DPD") Mayer Winograd, the head of the Essex County OPD, was also assigned to represent Mr. Douglas. ADPD Douglas and DPD Winograd met with Mr. Douglas several times while he was in jail.

On January 21, 1988, DPD Winograd informed Mr. Douglas that the OPD had conducted a financial investigation and determined that he was ineligible for legal representation by the OPD.[1] In its investigation, the OPD discovered that Mr. Douglas owned a house with a market value of $70,000 to $110,000, depending on its condition. Similar houses in the immediate area had recently sold for $90,000 and $125,000. DPD Winograd advised Mr. Douglas that he had "a right to Appeal to the Appellate Division which has exclusive jurisdiction" over the determination that he was not entitled to the appointment of counsel based on indigency. In his letter to Mr. Douglas, DPD Winograd cited *State*

---

[1]The OPD's representation was terminated pursuant to N.J. Stat. Ann. § 2A:158A-15.1. At that time, §2A:158A-15.1 provided that the OPD was responsible for determining whether an accused was entitled to appointed counsel because of indigency.

*v. Nilsen,* 214 N.J. Super. 23 (1986).[2]  A copy of the letter was sent to Judge Joseph A. Falcone, on January 28, 1988.

On February 2, 1988, Mr. Douglas appeared before Judge Falcone without counsel.  Judge Falcone informed Mr. Douglas of his right to appeal the OPD's decision to terminate his representation.  Judge Falcone requested that Mr. Douglas advise the court in writing of any developments of his attempts to persuade the OPD that he was entitled to the appointment of counsel.  Judge Falcone also advised Mr. Douglas to consider *State v. Nilsen,* 214 N.J. Super. 23 (1986) in deciding whether to pursue his claim that he was eligible for the appointment of counsel because he was indigent.

ADPD Douglas provided Mr. Douglas with the name and address of James Smith, the deputy public defender "charged with handling appeals in [the OPD's] appellate section," along with a notice of appeal form to facilitate an appeal of the denial of representation.  In a letter dated February 8, 1988, Mr. Douglas wrote to DPD Smith declaring that he challenged the OPD's determination that he was not eligible for representation.

During his next court appearance on February 16, 1988, Mr. Douglas informed Judge Falcone that he had corresponded with DPD Smith but had received no reply.  Judge Falcone again informed him of his right to appeal from the decision denying his eligibility for the appointment of counsel and scheduled the next appearance on March 21, 1988.  He also advised Mr. Douglas that

---

[2]*Nilsen* holds that "the Public Defender was vested with the authority to determine the eligibility of applicants for service."  *Nilsen*, 214 N.J. Super. at 25 (citing N.J. Stat. Ann. § 2A:158A-1.)  In *Nilsen*, the court explained that the New Jersey legislature "vest[ed] in the Public Defender the exclusive authority to determine whether a defendant who has been indicted is indigent and eligible for representation by the Office of the Public Defender." *Id.* at 26.  The *Nilsen* court also explained that "[i]f [a] rejected applicant wishes to contest the rejection, he or she should file an appeal with the Appellate Division [of the Superior Court] pursuant to R. 2:2-3(a)(2)." *Id.* at 27 (citing N.J. Ct. R. 2:2-3).

he should inform the court in writing of any developments in his appeal from the refusal of the OPD to represent him.

When the matter came before the court on March 21, 1988, and again on April 19, 1988, Mr. Douglas appeared without counsel. At the April 19, 1988 hearing, Judge Falcone provided Mr. Douglas with a copy of the *Nilsen* opinion which set forth the proper procedure for appealing the OPD's non-indigency determination.

On May 16, 1988, Mr. Douglas wrote to New Jersey Public Defender Alfred A. Slocum, seeking review of the OPD's non-indigency determination. He explained to Mr. Slocum that Judge Falcone had informed him at the April 19, 1988 hearing that DPD Smith was not authorized to represent him in an appeal from the decision of the OPD that he was not an indigent entitled to appointed counsel. He further stated that his inability to receive envelopes and stamps at the county jail, or use their photocopying equipment, had prevented him from contacting Mr. Slocum until the date of the letter.

At a subsequent court appearance on June 14, 1988, Judge Falcone informed Mr. Douglas that he should submit his appeal of the denial of appointed counsel to the Appellate Division of the Superior Court. That same day, Mr. Douglas wrote to Elizabeth McLaughlin of the Clerk's Office of the Superior Court of New Jersey, Appellate Division, seeking review of the determination that he was not an indigent. He stated in his letter that the property he owned was worth very little because it had been damaged by fire and was in need of extensive repairs. Mr. Douglas also informed Ms. McLaughlin that the cost of repairs would be $20,000, and that there was a mortgage on the property in the amount of $8,379.60, as well as water and sewage liens in the amount of $565.62 plus interest.

Section 2A:158A-15.1 was amended, effective on April 3, 1988. As amended, it transferred the determination regarding whether a defendant is indigent from the OPD to the court. Mr. Douglas was informed of this fact by Public Defender Slocum in a letter dated June 20, 1988. Referring to the then recent amendment to *N.J.S.A.* 2A:158A-2, Mr. Slocum wrote that:

Effective April 5, 1988 by virtue of newly enacted legislation, the Office of the Public Defender was relieved of the responsibility of determining indigency. This determination is now made by the judiciary. Even if you were to successfully appeal Mr. Winograd's determination, the Office of the Public Defender would not be able to decide whether you are indigent or not.

You should immediately write to the Essex County Criminal Case Manager requesting that they provide you with an application for representation by the Office of the Public Defender. If they determine that you are eligible for our services, we will again undertake your representation.

On July 11, 1988, Jack Trubenbach, Clerk of the Superior Court of New Jersey, Appellate Division, wrote to Mr. Douglas informing him that his appeal of the denial of court appointed counsel was rejected for failure to attach the appropriate documents. On July 25, 1988, Mr. Douglas wrote to Judge Falcone to inform the court of his lack of progress in obtaining counsel. He complained that he was misled by ADPD Douglas as to what was required for a successful appeal, and expressed general concern over the progress of his case. He also explained the difficulties he had experienced obtaining access to the library, to a copy machine, and other resources necessary for his appeal of the OPD's denial of representation, due to his incarceration and placement in protective custody.[3]

---

[3] Mr. Douglas's July 25, 1988 letter stated, in relevant part:

The information forwarded to me by Mr. Trubenbach makes me painfully aware of the misleading and erroneous "advise" given to me by my former Public Defender, Mr. Ollie Douglas, Esquire, vis a vis the nature and amount of information required concerning the appellate procedures. I am shocked than an attorney with the experience and expertise of Mr. Ollie Douglas would inform me that a letter would be sufficient, as if that is all that is required, in such a complicated matter as the appellate process.

I am very concerned about these proceedings and I have to wonder as to the intention and/or motive considering that type and quality of representation afforded me during the time I was being represented by the Office of the Public Defender . . . .

Also, I am curious that had I not mistakenly mailed the letter that I sent to Mr. Slocum, would I have been informed of the change in the legislation since the change occurred April 5, 1988 . . . .

As I had stated in previous correspondence, I am in Administrative Segregation Protective Custody in the Essex County Jail wherein I am allowed out of my cell one hour during the day and one hour in the evening. From June 23, 1988 through July 22, 1988, the telephone was removed from the tier. For two weeks prior to that the telephone was out of order. Also, as stated previously, access to the Law Library is limited to one day a week for one hour. Often library is cancelled, so we have had access to the library on the average of once a month. They copying machine has been operable only twice on the days I have been able to go to the library since May, requiring my continuing to have to send my letters out to be copied so that I may

11

At a hearing on August 18, 1988, Judge Falcone told Mr. Douglas that "the procedure has changed effective April of this year. It's not the Office of the Public Defender that makes the final decision as to whether or not an individual qualifies for representation. That decision is now left in the hands of the Court . . . ." Judge Falcone told Mr. Douglas that the most expeditious way for him to renew his request for representation would be to apply directly to the court, rather than continue with the appeal of the OPD's non-indigency determination. Judge Falcone explained that the procedure for obtaining counsel included the filing of forms and an interview by the probation department. Judge Falcone directed Probation Officer Frank Caporale to assist Mr. Douglas in completing the proper form 5A requesting the assignment of counsel. Mr. Douglas submitted an application for appointment of counsel with the court. Officer Caporale then "reported to the PD that defendant was 'conditionally eligible for public defender representation.'" Mr. Douglas did not pursue his attempts to appeal the OPD's initial non-indigency determination any further.

On August 26, 1988, Anthony Casale, criminal case manager for the Superior Court of New Jersey, Criminal Division, visited Mr. Douglas and informed him that, based on the information in the OPD's January 21, 1988 letter, Mr. Douglas was still ineligible for representation by the OPD.

In a letter dated August 26, 1988 addressed to Judge Falcone, Mr. Douglas described his interview with Mr. Casale. Mr. Douglas enclosed photographs of the property he owned and explained that the property was uninhabitable. Mr. Douglas complained that Mr. Casale had determined that he was not an indigent based on the information contained in the January 21, 1988 letter from the OPD terminating representation. On September 20, 1988, Judge Falcone ordered Mr. Casale to proceed with a new investigation of Mr. Douglas's eligibility for the appointment of counsel.

On October 6, 1988, Judge Falcone received a letter from Mr. Douglas which was dated September 19, 1988. Judge Falcone

---

have a copy for my files.

12

summoned Mr. Douglas to appear before him on October 12, 1988 and inquired as to why Mr. Douglas did not mail the letter directly to him instead of sending it first to Sheila Tucker. This procedure caused a two-week delay in receiving Mr. Douglas's mail. Mr. Douglas explained that the copy machine at the jail was broken so he had to mail the letter to Ms. Tucker so she could make a copy and then mail the letter to the judge. Judge Falcone observed that this was causing lengthy delays in all of Mr. Douglas's correspondence to him. Judge Falcone stated that the letter dated September 19, 1988 brought "quite a bit of additional information to [his] attention that [he] was never aware of." Specifically, Judge Falcone stated that he had been unaware of the considerable efforts Mr. Douglas had made to obtain counsel on his own, including contacting and meeting with several private attorneys in August and September of 1987, all of whom were unable for various reasons to represent him.

Mr. Casale attended the October 12, 1988 hearing. He informed the court that he had visited Mr. Douglas's house and confirmed that it had been damaged by a fire in 1985 and was essentially gutted. Mr. Casale also confirmed that there were liens against the house for taxes and utility bills. He told the court that he had contacted five private attorneys and asked if they would represent Mr. Douglas. Each declined to do so. Mr. Casale recommended that Mr. Douglas be assigned a Public Defender. Judge Falcone found that Mr. Douglas was an indigent entitled to representation by the OPD.

On November 2, 1988, DPD Winograd met with Judge Falcone in his chambers and informed him that ADPD Albert Kapin and ADPD Joseph Krakora would represent Mr. Douglas. ADPD Kapin and ADPD Krakora met with Mr. Douglas that same day.

A pretrial conference was held approximately five months later on April 3, 1989. At the conference, all of Mr. Douglas's pretrial motions were scheduled to be heard on August 7, 1989, and a trial date was set for September 18, 1989.

Carmeta Albarus, an OPD investigator, interviewed Mr. Gaskins on July 6, 1989. At the time of Mr. Douglas's arrest, Mr. Gaskins was infirm, suffering from emphysema, asthma, and heart failure. When Mr. Gaskins was interviewed by Ms. Albarus, he

13

was "hooked up" to an oxygen machine and had difficulty talking. Mr. Gaskins told Ms. Albarus that he did "not see Mr. Douglas with any weapons" at the time of his arrest. He expressed his willingness to testify on Mr. Douglas's behalf. Mr. Gaskins passed away sometime in September of 1989; the precise date does not appear in the record.

The court considered pretrial motions on September 6, 7, 12, 19, 20 and 21, 1989 and October 11 and 17, 1989.[4] At the close of argument on October 17, the court indicated that it would render its rulings on October 26, 1989.

On November 22, 1989, the OPD received a letter from Michael and Sheila Tucker, two defense witnesses, stating that the Tuckers were moving to Australia. Sheila Tucker had testified at the October 11, 1989 hearing on Mr. Douglas's suppression motion. On December 21, 1989, ADPD Kapin and ADPD Krakora wrote to Judge Falcone requesting that the court "set a schedule for the remaining hearings on the pretrial motion and a date for the jury selection," so they could schedule bringing the Tuckers back from Australia to testify. *Id.* at 167. The court did not respond to the request.

On February 22, 1990, while the pretrial motions were still pending, defense counsel filed a "Notice of Motions to Set Trial Date and Reduce Bail." The affidavit of counsel accompanying the motion reads in its entirety:

> 1. We represent the defendant Robert Douglas in this case.

> 2. This case has been pending since defendant's arrest on August 8, 1987. Defendant has been held in the Essex

---

[4]The pretrial motions included a motion to suppress evidence received from Mr. Douglas at the time of his arrest, suppression of evidence received from Mr. Douglas's apartment on August 8, 1987, motions relating to discovery issues and issues relative to aggravating factors, dismissal of the indictment and issues relative to identification.

14

County Jail since that time in lieu of $500,000 bail. As of February 19, 1990, no dates have been set for the remaining pretrial hearings or for jury selection. By letter dated December 21, 1989, we requested that dates be set, but no response to that letter has been received.

3. In addition to the prejudice resulting from defendant's continued pretrial incarceration, we assert that the ongoing delay in this case has prejudiced him in the following ways:

    a) Two defense witnesses - Sheila and Mickey Tucker - have moved to Australia.

    b) One potential defense witness Irving Gaskins - died in September, 1989.

    c) Without knowing the Court's rulings on the pretrial motions, we have been unable to finalize trial strategy.

    d) We are unable to give our fact and character witnesses any guidance as to the timing of the trial and we fear that it

15

will be increasingly difficult to enlist their cooperation.

e)  There is a strong possibility that the trial will be further delayed in the event either side takes interlocutory appeals from the Court's rulings on the pretrial motions.

f)  Such a long delay between arrest and trial may create the impression to the jury that the defendant's guilt is not really at issue -just the punishment to which he should be subjected.

4. We respectfully request that a trial date be set and that defendant's bail be reduced.

On March 9, 1990, Judge Falcone set a trial date of September 10, 1990 and announced that since he had been appointed presiding judge of the Criminal Division, he had reassigned this matter to the Judge Alvin Weiss. On May 18, 1990, Judge Weiss ruled on the pretrial motions which had been pending since October 17, 1989.

Jury selection began on September 10, 1990. The trial commenced on October 30, 1990, some three years after Mr. Douglas was indicted and approximately two years after ADPD Kapin and ADPD Krakora were appointed to represent him. On November 16, 1990, a jury convicted Mr. Douglas on all counts. The jury did not vote to impose the death penalty. Mr. Douglas was sentenced to two concurrent terms of life imprisonment. The Appellate Division of the New Jersey Superior Court affirmed the

16

conviction on June 23, 1995.  The New Jersey Supreme Court denied certification on October 11, 1995.

## B

On December 2, 1997, Mr. Douglas filed a petition for post-conviction relief in the Superior Court of New Jersey, Essex County ("PCR Court").  He alleged that he was denied his right to a speedy trial and to the appointment of counsel during a critical stage in the adversary proceedings.  Mr. Douglas also complained of prosecutorial misconduct and ineffective assistance of counsel.  Mr. Douglas alleged that his counsel was ineffective because they failed to move for dismissal due to the extended pretrial delay.  The PCR Court granted relief to Mr. Douglas based upon his claim that his Sixth Amendment right to a speedy trial had been violated.  It denied the remainder of his claims.

The PCR Court applied the four-part test enunciated in *Barker v. Wingo,* 407 U.S. 514 (1972) in determining that Mr. Douglas was denied a speedy trial.  In *Barker*, the Supreme Court set forth the factors that must be balanced to evaluate a speedy trial claim as follows:  "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530 (citing *United States v. Simmons*, 338 F.2d 804, 807 (2d Cir. 1964).  With respect to the length of delay, the PCR Court quoted *Hakeem v. Beyer,* 990 F.2d 750 (3d Cir. 1993) for the principle that a delay of 14 months, measured from the date of arrest until the commencement of trial "is not dispositive in and of itself, but is sufficiently lengthy to warrant an inquiry into the other facts."  Transcript of PCR Proceedings, September 25, 1998, at 91 (quoting *Hakeem,* 990 F.2d at 760).  The PCR Court concluded that "a delay of 30 months to the date they fix the trial [date] and 38 months till you get to trial passes the test of presumptive prejudice and therefore requires an analysis of the other factors in the case." *Id.*

The PCR Court attributed the reason for delay to the state's failure to provide Mr. Douglas with counsel, holding that "[w]hen the courts and/or the Public Defender's Office drops the ball, that still affects the defendant's rights," and "the investigation which should have been undertaken promptly by the public defender was not undertaken and a limited investigation was done." *Id.* at 97.  The PCR Court noted that this was a capital case, requiring early

17

preparation of counsel, *id.* at 96, and emphasized the errors made by the trial court and the OPD. *Id.* at 96-98. The PCR Court concluded that Mr. Douglas had asserted his rights, stating that it was "abundantly clear that the defendant was constantly complaining that he wasn't getting representation, that he wasn't able to establish his innocence and wasn't able to have his day in court." *Id.* at 91-92. The PCR Court also found prejudice due to the death of Mr. Gaskins. *Id.* at 99.

With respect to the ineffective assistance of counsel claim, the PCR court concluded, after an evidentiary hearing, that Mr. Douglas's Sixth Amendment rights had not been violated. As the PCR Court expressed it, "I do not find that the defendant has established in any way, shape or form that . . . any errors which may have been made by counsel were so serious that counsel was not functioning as the counsel guaranteed the defendant by the 6th amendment." *Id.* at 56.

With respect to the charge that counsel had provided ineffective assistance by failing to file a speedy trial motion, the PCR Court credited counsel's testimony, finding as follows:

> "[Counsel] didn't file the motion to dismiss for lack of a speedy trial because that would have required him to disclose trial strategy. And I think more importantly, he couldn't imagine the motion being granted considering the nature of the case."

*Id.* at 57-58.

The Appellate Division of the Superior Court of New Jersey ("Appellate Division") reversed the PCR Court's ruling that Mr. Douglas was denied his constitutional right to a speedy trial and affirmed its disposition of the remaining claims. As to the length of the delay, the Appellate Division held that "a three-year delay does not by itself give rise to prejudice or denial of the right to speedy trial." *State v. Douglas*, 322 N.J. Super. 156, 171 (1999) (citing *State v. Long*, 119 N.J. 439, 469, 575 A.2d 435 (1990)). Relying on a study conducted by a New Jersey Governor's Commission, the Appellate Division observed "that capital cases

18

in New Jersey are generally not tried for two years following indictment," *id*., and determined that, because Mr. Douglas did not appear to be entitled to appointed counsel, the PCR Court put too much emphasis on the OPD's withdrawal of representation, the subsequent difficulties in challenging that decision, and the failure of the trial court to recognize that it was responsible for appointing counsel as of April 3, 1988.  *Id.* at 172-73.

The Appellate Division determined that the reason for the delay was the appellate process.  "[I]n no event can it be said that advising defendant of his need to pursue an appeal and reliance by the courts and PD on that requirement, as required by law at the time of the PD's decision, was a deliberate attempt to hamper the defense."  *Id.*  Regarding the third *Barker* factor, the Appellate Division did not specifically discuss whether Mr. Douglas had preserved his Sixth Amendment right to a speedy trial before the trial court.

The Appellate Division further held that Mr. Douglas failed to demonstrate prejudice because "Gaskins died months before the [February 22, 1990] motion was filed."  *Id.* at 174.  "[A]ny prejudice concerning Gaskins' death is merely speculative," *id*., and, in light of the weight of other evidence presented at trial, including the testimony of the surviving victim, "the testimony of all the officers that defendant had a loaded handgun in his possession at the time of his arrest in the Gaskins' apartment, and the discovery of the holster in defendant's apartment," Mr. Gaskins' testimony would not have impacted the verdict.  *Id.* at 174-75.

The New Jersey Supreme Court denied Mr. Douglas's petition for certification.

## II

Mr. Douglas filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on December 8, 1999.[5]  The District Court

---

[5]The District Court accurately categorized Mr. Douglas's claims as:

> (1) denial of speedy trial rights; (2) erroneous reinstatement of

19

held that Petitioner had not made a substantial showing of the deprivation of a constitutional right as required under 28 U.S.C. § 2254 and denied the petition. Mr. Douglas has filed a timely appeal. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

## III

### A

Mr. Douglas contends that the District Court applied the wrong standard of review. We disagree. As the District Court correctly noted:

> [F]ederal habeas corpus relief is denied to any claim which was adjudicated on the merits in a state court proceeding, unless such application (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court; or (2) resulted

indictment; (3) unconstitutional search and seizure; (4) unconstitutional arrest warrant; (5) inadequate representation, including denial of counsel, constructive denial of counsel and ineffective assistance of counsel; (6) denial of fair trial, including prosecutorial misconduct, erroneous admission of evidence, erroneous jury instructions, failure to declare mistrial and verdict against the weight of the evidence; (7) denial of a direct appeal; (8) erroneous opinion by the Appellate Division; (9) denial of a speedy appeal and (10) deprivation of liberty. *Douglas v. Hendricks,* 236 F. Supp. 2d 412 (D.N.J. 2002).

in a decision that was based on an unreasonable determination of the facts in light of evidence presented in the state court proceeding.

*Douglas*, 236 F. Supp. 2d at 425 citing 28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court explained that

[u]nder the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-413. For the writ to issue, the state court's application of federal law must be objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).

The District Court correctly quoted the standard of review set forth in §§ 2254(d)(1) and (2). It also appropriately applied the Supreme Court and Third Circuit authorities that have interpreted that standard. The District Court also accurately noted that "[t]he AEDPA increased the deference federal courts must give to factual findings and legal determinations of the state courts." *Douglas,* 236 F. Supp. 2d at 421.

Mr. Douglas has correctly pointed out that the District Court in one place misquoted the standard of review under 28 U.S.C. § 2254(d)(2) and that the misstatement was quite similar to one of two errors we identified in *Johnson v. Carroll*, 369 F.3d 253, 259

(3d Cir. 2004). However, Mr. Douglas's petition does not turn on the § 2254(d)(2) standard since he is arguing that his detention is the result of an unreasonable application of clearly established Supreme Court precedent to the facts under § 2254(d)(1). He makes no claim to habeas relief based on any allegedly unreasonable determination of facts under § 2254(d)(2) and so this misstatement is not relevant to the present appeal.

**B**

Mr. Douglas also contends that the District Court erred in denying relief on his claim that his Sixth Amendment Right to a speedy trial was violated. The District Court's legal conclusions regarding Mr. Douglas's speedy trial claim are reviewed de novo. *Burkett v. Fulcomer*, 951 F.2d 1431, 1437 (3d Cir. 1991) (citing *Lesko v. Owens*, 881 F.2d 44 (3d Cir. 1989).

The District Court correctly concluded that it "will not consider how it would have applied the *Barker* test because habeas relief is only available where the state court's application is 'objectively unreasonable.'" *Douglas,* 236 F.Supp. 2d at 425 (quoting *Williams*, 529 U.S. at 409). The District Court stated that is was "constrained to deny Petitioner relief on this ground because the Appellate Division's decision did not involve an unreasonable application of clearly established federal law . . . ." *Id.* Accordingly, the District Court held that the strict standard set forth in 28 U.S.C. § 2254(d)(1) compelled the denial of Mr. Douglas's habeas corpus petition. This Court is bound by that same strict standard.

As evidenced by the decision of the Appellate Division, reasonable jurists may disagree as to the correct disposition of Mr. Douglas's speedy trial claim. However, because the decision by the Appellate Division was not objectively unreasonable, we must affirm. *See Williams*, 529 U.S. at 411 ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

The Appellate Division recognized that the three year period from Mr. Douglas's arrest to the commencement of trial was of sufficient length that it was required to make a full inquiry into and to balance each of the *Barker* factors to determine whether he was denied his right to a speedy trial. The record shows that ADPD Douglas was appointed to represent Mr. Douglas on August 12, 1987, three days after his arrest. The OPD withdrew from representing Mr. Douglas on January 21, 1988 because it had concluded that Mr. Douglas was ineligible for appointed counsel. During that period of representation, ADPD Douglas met with his client, prepared a witness list, and authorized the interrogation of potential defense witnesses. Mr. Douglas was not represented by counsel for nine months and twelve days because of the procedural confusion caused by the change in the statute transferring the determination of indigency from the OPD to the trial court.

ADPD Kapin testified during the PCR Court proceedings that in his experience, it is not uncommon to spend two to three years preparing for the trial of a capital case. Mr. Douglas's case came to trial three years after he was charged.

With respect to the length of the delay, the Appellate Division noted that three years was not an extraordinary pretrial period for a capital case, citing data indicating that such cases commonly take at least two years to get to trial. The court explained that this was in part due to the fact that counsel were required to prepare during that period not only a defense to a very serious charge but also the defendant's mitigating factor position for the penalty phase.

In *Barker,* the prosecution sought and obtained a series of sixteen continuances to facilitate the prosecution of Silas Manning, Willie Barker's cohort. 407 U.S. at 516-17. The prosecutors in *Barker* believed they needed to first obtain Mr. Manning's conviction in order to avoid the assertion by Mr. Manning of his privilege against self-incrimination and assure his testimony against Mr. Barker. *Id.* at 516. Here, by contrast, the two principal reasons for the delay were the good faith albeit erroneous conclusion by the OPD that Mr. Douglas was not an indigent and the failure of the trial judge to inform Mr. Douglas until August 18, 1988 that, due to a change in the law in April, indigency determinations were no longer the responsibility of the OPD.

While the "ultimate responsibility for such circumstances must rest with the government rather than with the defendant," 407 U.S. at 531, the record in this case shows that there was no deliberate attempt to delay the trial in order to hamper the defense. The trial court scheduled several hearings in order to learn about Mr. Douglas's efforts to retain private counsel and the progress of his efforts to demonstrate that he was an indigent.

With regard to the reason for the three-year pretrial delay in this case, the Appellate Division concluded that "[a]ll pretrial time was productively used once defense counsel were assigned, and when they asked that a trial date be set, it was fixed in accordance with a schedule satisfactory to the defense." *Douglas*, 322 N.J. Super. at 171. As to the proceeding period, the court found that "the judiciary's failure to be more aggressive in reviewing defendant's claim of indigency" was not excusable. At the same time, it concluded that "in no event [could] it be said that advising defendant of his need to pursue an appeal and the reliance of the court and the PD on that requirement . . . was a deliberate attempt to hamper the defense." *Id.* at 171-72.

"A defendant who fails to demand a speedy trial [does not] forever [waive] his right." 407 U.S. at 528. However, "failure to assert the right will make it difficult for [petitioner] to prove that he was denied a speedy trial." *Id*. at 532. A pro se criminal defendant does not have to make a procedurally perfect assertion of his speedy trial rights, but must make a "reasonable assertion" of the right so as to put authorities on notice of his Sixth Amendment claim. *Gov't of the Virgin Is. v. Pemberton*, 813 F.2d 626, 629 (3d Cir. 1987).

Whether or not the February 22, 1990 motion can be construed as one for a speedy trial,[6] it is clear from the record that

---

[6]When ADPD Kapin was asked at Mr. Douglas's PCR hearing whether the February 22, 1990 motion was a "speedy trial" motion, he stated that "whether it's called a speedy-trial motion, I believe the effect was basically the same, we wanted a speedy trial date . . . ." He also testified, however, that Mr. Douglas would have been prejudiced by an unsuccessful motion to dismiss on speedy trial grounds because it would have revealed his trial strategy.

Mr. Douglas made a "reasonable assertion" of his Sixth Amendment right to a speedy trial. As Mr. Douglas points out in this appeal, his well-documented efforts to secure counsel are properly viewed as part and parcel of his efforts to assert his Sixth Amendment right to a speedy trial. Mr. Douglas's continuous requests for counsel were founded, in large part, on his concern that he be given an opportunity to prove his innocence before evidence was lost. For example, in his correspondence of May 16, 1988 with Public Defender Slocum, Mr. Douglas expressed concern over the delay in his case:

> During the five months I was being represented by the Office of the Public Defender, Essex Region, to my knowledge, only four statements were obtained. Three individuals, Mr. Donald Well [address omitted]; Mr. Calvin Bonds [address omitted]; and Mr. Gene Sutton, address unknown, came to the Office of the Public Defender to make statements, but no statements were taken from these persons.

> To prove my innocence, it is imperative that I have a fair trial with proper representation and competent defense presentation.

In his July 25, 1988 letter to Judge Falcone, Mr. Douglas wrote: "Conducting an investigation, locating witnesses and relying on memories after a year may be tenuous at best. Day by day the chances that I may be able to prove my innocence may, perhaps, become more and more remote." Mr. Douglas's assertion of his right to a speedy trial alone, however, is not sufficient to undermine the overall reasonableness of the Appellate Division's *Barker* analysis. *See Barker*, 407 U.S. at 533 ("none of the four factors identified . . . [is] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial").

25

Finally, on the question of prejudice, the *Barker* Court held that "[i]f witnesses die or disappear during a delay, the prejudice is obvious." *Barker*, 407 U.S. at 532. The *Barker* Court also instructed, however, that

> [w]e regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.

*Id*. at 533.

The Appellate Division concluded that there is

> nothing in the record to suggest that defendant was unduly prejudiced by the delay which can be attributable to the assignment of counsel at the outset of capital proceedings. Such proceedings would have, of necessity by virtue of the needs of the defense team in a capital case, carried beyond the death of Irving Gaskins or any other event which defendant points to as the basis for his claim of prejudice.

*Douglas*, 322 N.J. Super. at 173.

Mr. Gaskins died in September 1989, approximately twenty-five months after Mr. Douglas's arrest. The record shows that the defense team's need to prepare for trial and a a possible penalty phase in a capital case would have continued beyond the date of Mr. Gaskins's death. ADPD Kapin testified that in his experience, "it is not uncommon to spend two to three years in preparing for

26

trial." Here, the record shows that the defense team was not prepared to request a trial date until five months <u>after</u> Mr. Gaskins died. Furthermore, as noted by the Appellate Division

> any prejudice concerning Gaskins' death is merely speculative. . . . [T]he nature of Gaskins' statement regarding what he did not see without a fuller explanation of what he did observe . . . does not warrant the granting of post-conviction relief on the grounds that defendant was prejudiced by virtue of the pretrial delay.

*Douglas*, 322 N.J. Super. at 175. We conclude that the Appellate Division's balancing of the *Barker* factors was not objectively unreasonable.

## C

Mr. Douglas argues that habeas corpus relief should be granted because he was denied counsel at a critical stage during the prosecutorial process. "[A] constitutional violation is *per se* prejudicial only if the error occurs during a 'critical stage' of the prosecutorial process." *Bell v. Cone,* 535 U.S. 685, 695-96 (2002) (holding that "[a] trial would be presumptively unfair . . . where the accused is denied the presence of counsel at 'a critical stage'"). "The [Supreme] Court has identified as 'critical stages' those pretrial procedures that would impair defense on the merits if the accused is required to proceed without counsel." *Gerstein v. Pugh*, 420 U.S. 103, 122 (1975); *see also Coleman v. Alabama*, 399 U.S. 1, 9 (1970); *United States v. Wade*, 388 U.S. 218, 226-27 (1967). Mr. Douglas was afforded counsel at trial and at every hearing where the merits of his case were argued. Mr. Douglas has failed to demonstrate that he was denied counsel at a critical stage in the proceedings.

## D

Mr. Douglas alleges ineffective assistance of counsel on the ground that his trial counsel failed to move for dismissal due to the extended pretrial delay. Claims of ineffective assistance of counsel

27

are evaluated pursuant to the standard enunciated in *Strickland v. Washington,* 466 U.S. 668 (1984). It has two components. "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. When a convicted defendant complains of ineffective counsel, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-88. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. And Mr. Douglas must show there is a reasonable probability that, but for counsel's unprofessional errors, if any, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Judicial scrutiny of counsel's performance must be highly deferential because "it is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, . . . to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight. . . ." *Id.*

The District Court correctly concluded that the PCR Court's decision, which was affirmed by the Appellate Division without comment, was not contrary to, nor an unreasonable application of, the two-part *Strickland* test. ADPD Kapin testified at the PCR Court proceedings that he could not imagine that, given the nature of this case, a motion to dismiss for failure to comply with speedy trial requirements would have been granted. He stated that he was more concerned about getting the case set for a trial so it could be litigated. He also stated that making a motion for a dismissal on speedy trial grounds would have required disclosure of the defense trial strategy and, in his opinion, would have been denied. We agree with the PCR Court that Mr. Douglas has failed to demonstrate that his attorneys' performance was defective.

We also agree with the PCR Court's determination that Mr. Douglas has failed to demonstrate that he was prejudiced by his counsels' failure to move for a dismissal on speedy trial grounds based on the death of Mr. Gaskins prior to the trial date. As the Appellate Division observed, "any prejudice concerning Gaskins' death is merely speculative." *State v. Douglas*, 322 N.J. Super. at 174 (addressing the fourth *Barker* factor in analyzing Mr.

Douglas's Sixth Amendment right to a speedy trial). The Appellate Division continued,

> given the identification of defendant
> by Ms. Broadway, the testimony of all
> th officers that defendant had a loaded
> handgun in his possession at the time
> of his arrest in the Gaskins apartment,
> and the discovery of the holster in
> defendant's apartment, all as detailed
> in our opinion on direct appeal, we
> conclude that Gaskins' death (coming
> as it did after the Public Defender's
> interview without an endeavor to
> preserve his testimony, the nature of
> Gaskins' statement regarding what he
> did observe, and the giving of that
> statement long before a motion was
> made to fix a trial date) does not
> warrant the granting of post-
> conviction relief on the grounds that
> defendant was prejudiced by virtue of
> the pretrial delay.

*Id*. at 174-75.

We agree with the Appellate Division's reasoning with respect to *Barker*'s fourth "prejudice" factor.[7]  Mr. Douglas has

---

[7]Judge Stapleton agrees that Mr. Douglas has not satisfied *Strickland*'s second prong because a motion to dismiss on speedy trial grounds would have been unsuccessful.  To the extent our conclusion on this issue or our conclusion regarding prejudice under *Barker*, rests on the assertion that Gaskins's testimony would not have been helpful to Mr. Douglas, Judge Stapleton disagrees.  In his view, even if Gaskins's testimony had been regarded as helpful to the defense, a speedy trial motion would have been properly denied because, as the Appellate Division also concluded, there was no causal nexus between the unexcused nine month delay and the loss of Gaskins's testimony; that loss would have occurred even if there had been no such delay.

failed to demonstrate that the Appellate Division's conclusion, (1) that his counsel were not ineffective in failing to move for a dismissal, and (2) that he was not denied a speedy trial due to the fact that Mr. Gaskins died before trial, was objectively unreasonable. Accordingly, the decision of the District Court will be AFFIRMED.